Pineda v. Ford Motor Company Good morning. May it please the court, my name is Scott Withers. I'm on behalf of Len Mackerling. I'm appearing here on behalf of the appellant in this case, Jose Pineda, who is a member of the board of the Appellant's Association. I'm here on behalf of the appellant in this case, Jose Pineda. I'm here on behalf of the appellant in this case, Jose Pineda. Well, Judge McKee, I think you have to look at first what the expert based his opinions on. He examined the rear liftgate on the subject explorer in this case. He examined the different designs on the 2003 Ford Explorers. This was a 2002 in this case. He compared those model year designs. He reviewed all the witness depositions taken in this case from the eyewitnesses on the scene when the liftgate glass broke. He personally met with Pineda and discussed how the accident happened. Everything is so subjective and you have one expert coming in, Mr. Clausen comes in and said, I looked at A, I looked at B, I looked at C, I read D and E. This is my conclusion. You have another expert that comes in and says, I looked at C, D, E, F, G and talked to Z and I have a contrary conclusion. There's nothing beyond the subjective conclusion that can be reached to get a handle on that. And that's why I asked about the methodology. Is there any way of getting some kind of methodology or some approach to reaching a conclusion which can be tested or can be repeated or verified other than his own subjective opinion, his subjective conclusion of the results of what he's looked at and where that takes him? Well, I think that that is very difficult for a technical expert such as an engineer to do. You do a stress test. You at least find out how much force has to be applied to the glass. What the difference in the force on that glass is with the struts attached, without the struts attached. You take the torque values that have to be applied to the nuts and you figure given the amount of stress per square inch or however they measure it, resulting from the torque of that nut as Ford says you've got to torque it, the amount of stress on the glass with the struts being added to that from the force of the nuts on the glass. And then you get some kind of, and I'm certain no physicist or anything like that, Mr. Slutsman high school physicist if you're here would agree with that. You then look at all the force on that glass per square inch and then you figure out if you mount the glass in the following manner, given the load that's on that glass it's going to shatter. And then you tell the company that you've got to have something on there to tell the mechanic not to, and you don't have to talk in technical terms, but you have to have some kind of warning which is telling the mechanic to not put X amount of load on that glass or it's going to crack. And I guess in a perfect world if we had that we'd be ahead of this. But our position is that in this kind of case where you've got four documents dated as early as April 2001 regarding the problems with the rear lift gates, prior incidents of these kind of failures occurring, the whole reason that we want this testing is for causation. And both experts were able to, based on the same methodology they used, without doing this field testing that Your Honor is mentioning, they were able to come to conclusions as to how the glass broke. Now our conclusions are a little bit different in that our expert says it was a result of him engaging in the repair in the manner and the temporally of the steps he followed to do that. And the other side is saying no, it was because he put the hinges on and he repaired this with the hinges in place. In any event, you get to the end and both experts, the one whose opinion is being precluded and Ford's own expert, come to a conclusion that it was the way that the glass was put on to the lift gate itself that caused the breakage. So you get to that causative factor and it's a question for the jury as to whether instructions was a help. But this is a failure to warn case, right? It is. So, I mean, you've got an engineer who clearly, my guess would be highly qualified if it were a design defect case, as you were talking about, but a failure to warn case. The question here is that it appeared that the person had some difficulties trying to say what kind of warning would be given. In fact, there had to be prompting by the judge here. In that context, to me, the overarching question is, don't we give a great deal of deference to that decision one way or the other? I'll accept you in this failure to warn case or I will not. Well, are you talking about the specific finding by the judge here that he wasn't a warnings expert? Well, he was conceded, he wasn't of the, Clouser conceded, I believe, he was not a warnings expert. Right. So, didn't that make it, oftentimes what happens, as I have seen it, the judge may say, oh, heck, I'll let you come in anyway. And we don't disturb that. But if the judge says, I'm not going to let you come in under Daubert, usually we don't disturb that either because of the degree of deference. So it's a fairly tough hill to climb. How do you get us up that hill to say, hey, wait a minute, this case was so significantly a mistake that the judge should have let Clouser testify as a failure to warn, even though Clouser admitted he wasn't an expert in this area? Yes, he admitted he wasn't a warnings expert. And I would say that if this was the type of case when we were looking at a warning that provided, if Ford had provided a warning in this case that the glass might shatter and that you needed to specifically follow these steps, you might need a, quote, warnings expert to testify about linguistic display, syntax, emphasis, the specific language that was used in the warning and how that warning is going to be received by individuals. That's not this case. This is a case where Ford failed  But this is a failure to warn. It's a failure to warn case, but not where you're taking two instructions and putting them side by side and looking at those instructions such that you need a, quote, warnings expert. You've got a situation here where Ford doesn't issue any instructions at all on the safe way to replace these hinges. There were some instructions. There was a shop manual for that. There were two things, a shop manual and a repair manual. And that shop manual, you had to go to a different section of that shop manual for these instructions Well, it told you how to install it and you told it how to remove it and it said reverse the process. According to your own expert, the repairman went to the manual to get the proper torque. It even said in his report that the hinges didn't have the proper torque on them, so he went to the book was the phrase. He went to that book. And so there was some instruction out there. And our argument here is that it was a failure to provide warnings and a step-by-step instruction for the removal and replacement. Well, that's two different things. There was a step-by-step instruction. He showed whether or not he had to place warnings in addition to the step-by-step. Our position was that that was not a substantial, that step-by-step was completely inadequate. In fact, what I heard the magistrate judge saying is, look, what else besides what was there should have been done? What language would you have used? And Clouser really didn't have a response. Well, I believe Clouser responded that he would use Ford's subsequently issued warning. After prompting, that's correct. Yes. After prompting. That is correct, Judge Ambrose. Counsel. Yes, Judge Arenas. He writes this report and the second report. He writes two reports. He writes the first report. He's deposed. He writes the second report. This is all before the Daubert hearing. Right? He says the lift assembly, the lift glass assembly, is defective. It's defective, he says, because it tends to shatter too easily for a reason when repaired. Right? Yes. Okay. And he says that, and the warning is kind of almost a throwaway. He basically says, and by the way, not only is it effective, somebody should have been warned about this defect, and the warning should have been effectively say, if you don't follow these very specific steps, you're increasing the risk. You then withdraw. All of a sudden, at the Daubert hearing, you withdraw the defect. Yes, trial counsel did withdraw that. Remember, so he hasn't even written a report in the context yet of just a warning, facing a case where the product is not alleged to be defective, merely an inadequate warning. He's actually never written a report in that context, in the context of we now are only dealing with, in effect, the risk that would attend a repair. So his position seems to be now, if I understand it correctly, your position and his position is, okay, it's not defective. It's not an effective assembly anymore. However, it's one which, if the repair is not done in a very precise fashion, there's a risk to the repairman, not to the user, but to the person repairing the car. Okay? And what he seems to be saying is that a warning, to be effective, has to, number one, explain what the risk is, that the glass is going to shatter, advise the person that he must follow very specific procedures in a very specific order. It's not just what has to be done, but the order it has to be done. And then you have to wear protective clothing, which he wasn't wearing, because there's still a risk of shattering glass, which would be ameliorated if he had pants on, he was wearing shorts, if he had a long-sleeved shirt on, goggles, kind of goggles on. That's his position, right? Yes, Your Honor. And then he's saying that the 2004 instructions from Ford would do that job. I agree, Your Honor. Right. Is that what you're saying? I mean, the only thing I would respectfully disagree with is that the original expert report dealt with both issues. I don't think it's fair to say it dealt solely with the design defect issue. Yeah, but any time you have a defective product, kind of a fair to warn almost gets tagged onto it. It's defective. And by the way, you better tell the public. That's jerky. You've got to tell the public about this. But here, if you withdraw it, I mean, it really has implications, because now you're saying there's nothing wrong. It's not a defective product. It's a good product. Okay? But it has a risk to a repairman if he doesn't do things in a very specific manner. Right? Yes, Your Honor. Okay. Why is he not qualified to give that opinion? I believe he is. I believe he is qualified to give that opinion, just as, based on his qualifications, based on his understanding of all the literature that Ford provided in Discovery regarding why this change needed to be made, all the prior accidents and failures, et cetera. To what extent can he use the 2004? You know, the 2004, what he relies on very heavily, quite candidly, he relies on his own expertise about the risk of shattering. Yes. And pretty learnedly, he talks, he's got a lot of experience in that. And so the risk of shattering, he speaks from his own knowledge to some degree. But as to what the proper way of dealing with it, he relies rather heavily on Ford's own 2004 publication, two years after the accident happened. Okay? Yes. Defense, yeah, the defense says, just a minute, remedial measures are not allowed. Rule, whatever it is, 407. It says remedial measures are not allowed. You can't do that. You can't rely on that. What's your answer to that? My answer to this is that you have to... Your answer is three numbers. What are the three numbers? 703. Yes, it's relevant. I would say it's relevant and reliable. But my other argument is that 407... No, no, no, no. You don't like the 407? No. Okay, then I argue 703. What does 703 say? 703 gives us the... It says that things that are not otherwise admissible to evidence may still be used by an expert if experts use those kinds of things to render their opinion. The late, great Judge Hunter, this court, lost a case in the 50s, which I spent 20 years trying to avoid, in which an expert used all kinds of inadmissible evidence, even before the rule. And the New Jersey court said, no, that's okay. An expert doesn't have to use only admissible evidence. And then it even deals with the question of can you let the jury know about that or not. That's even dealt with in the rule itself. Isn't that your argument? That is one of our arguments, Your Honor, yes. He can rely on what might be otherwise inadmissible for that opinion. But the other argument is regarding 407, and the policy behind excluding the remedial measure is to reject a suggested inference of fault by the manufacturer. And in this case, Mr. Panetta would be more than happy to introduce those warnings without attributing them to Ford or Judge McKee by giving a cautionary instruction under Rule of Evidence 105 such that you can still make that argument in addition to 703. 703 specifically in the advisory notes talks about a jury instruction. Absolutely. So you're saying it's not really an issue at all of a warnings expert per se, but whether or not, given the construct of that glass on the hinge of this truck, a warning, forget what the content of that warning is, but whether or not a warning is necessary. Yes, that's exactly it, Judge McKee. I believe you understand my argument, unless you have any further questions. Thank you very much, Your Honor. I did not. Okay. Good morning. May it please the Court, my name is Kristen Dennison, and I'm here on behalf of Ford Motor Company. Why isn't this a case of what we just got done talking, Mr. Withers, about? The issue is not all the psychometrics that go into perception in determining where you put the warning, what the warning is supposed to say, the size of the font, the color of the background, all that business. We never get to that. The issue is simply whether or not, given the way that glass and the struts and the hinge combine, a warning is necessary. And then down the road we can get to what the warning is like. Whether or not a warning of some kind is required to let the mechanics know that if you don't do this in a certain order, the glass is going to shatter. Well, there are a couple of reasons why this isn't that type of case. First, this is not a case in which a lower court prohibited an expert from testifying simply that a warning should have been provided to the general public. What is important to note here is that the warning that was, that previously alleged should have been provided, should have been provided to an experienced mechanic who both looked at instructions that were provided in performing this repair but also admittedly knew of the dangers of installing glass and, in fact, stated that issues involving installing glass were common sense, that glass could break. I'm just going to say I don't have to be any kind of expert to know that it's dangerous to start applying torque to a sheet of glass. Your Honor, yes. What we're getting at here and the only way that plaintiff could, plaintiff's expert could really bring his opinion here is to state not just that a warning should have been provided but that expert, Mr. Clauser, was going to necessarily have to get to language and specifics as to what type of warning should have been provided to an experienced mechanic. He did. He just took, he looked at yours, the 2004, and says that's the kind of thing it should be, very specific. How more specific can you get than that? Respectfully, Your Honor, Mr. Clauser never said, look at the 2004 warning, this is what should be provided. When pressed, he said that it was adequate, it was okay, but he specifically declined in that discussion in the Daubert hearing to apply this to a specific warning. But that does beg the question, Your Honor, as to whether somebody who's not qualified as a warnings expert should be permitted to offer specific language. What is a warnings expert? Who would be qualified? Your Honor, somebody who would be qualified on warnings is more like a human factors expert who can testify as to what the actions would have been, which leads to the causation element. It's not sufficient just to say that a warning should have been provided, but that warning, the expert needs to state not only that the warning needed to be provided, but that it would have prevented the plaintiff's injuries in this case. What is a human factors expert? Is that what that person just does? It talks about causation and psychologically how people react to certain kinds of information? Yes, Your Honor. Look, a friend of mine is the former chairman of the Princeton Psychology Department. He has testified many times as maybe what you would call a human factors expert, where he says, well, you put the warning on the bottom, there's no light, nobody would see it, it's not worded in a way that anybody would follow. Here you have that the people who will be injured are repairmen. They're people who you can anticipate will follow instructions. This person did. He went to the book and looked. So his real expert testimony, his real expertise says, you have to tell this person, A, that there's a risk of glass shattering, and B, that to avoid it, this is what you have to do. This is how you avoid it, which is exactly what Ford did in 2004. Human factors has nothing to do with it in this case. That's why I said the phrase warning. He's not a warnings expert in the sense of a human factors person. He can't tell you. As Judge McKee said, what kind of strips should you have? Where the light should be? Where should it be? Should it be big letters, small letters? What's human perception? We're talking about a repairman who's going to look at the manual. And he said you have to tell that person, A, what the risk is to wear safe clothing and to follow the instructions not only as to torque and everything, but the order in which you do things is also very important, he says. Yes, Your Honor, and one of the reasons why, in this case, Mr. Clauser would have had to get more into the human factors analysis is twofold. One is that, in this particular case, the glass was mispositioned initially. The glasses, I'm sorry? The glass itself was mispositioned at the time when Mr. Panetta was performing these repairs. Now, Mr. Clauser, this is where... That sounds like an engineering point. Right, if the glass is... Yes, Your Honor. Okay. But what Mr. Clauser does state during the Daubert hearing is that this is not something that would need to be instructed, and this is something that you would expect an engineer to be able to recognize, that the glass was mispositioned. So there's two problems with the fact that the glass was mispositioned. The first problem is that it does go to show that this is something that an experienced mechanic should have noticed that Mr. Panetta did not notice and that did not need to be instructed on. The other very significant point is that Mr. Clauser cannot rule out, and admitted he could not rule out, that the glass mispositioning could have in and of itself caused the glass to shatter in this case, which again gets to the causation element. But causation, the fact that you have another argument about causation doesn't mean an expert isn't qualified. It just means that there's another theory of the case that you can argue to the jury. Well, Your Honors, it becomes a Daubert problem when you get back to the unreliability of the opinions and the unreliability of Mr. Clauser's opinions as to any effect as to why the glass shattered in this case because he did not perform any testing, measure any stresses, and he did not come to any reasonable basis as to how the glass shattered. And without being able to come to that basis, he could not come to any sort of conclusion that there should have been a warning which would have prevented cleanness injuries in this case. Let's assume that there are two conflicting possible causes. One is the order in which the glass is mounted. The other is the position the glass is in when he's performing the operation and when he's mounting it. No matter which of those causes the injury, that doesn't alleviate the necessity for warnings, does it, in terms of the order in which the procedure is done? You can then argue to the jury that that wasn't the cause in this case, but does that get around the need for warnings, the need to do with the 2004 instruction manual, workshop manual instructed? Well, it does, Your Honor, if the fact of a warning or the lack of a warning has no bearing or relevancy to the issues in the case. If the question is that the accident occurred simply because the glass was mispositioned and the reason this is important is because Mr. Clauser could not, he actually never came to a conclusion that it was only because of a failure to follow, of a failure for a warning to provide proper instructions as to why the glass shattered. I guess what I'm trying to get at is if you're right about the mispositioning of the glass and if Ford is right in the 2004 workshop manual that unless the operation is done in a certain order, the glass could shatter, then don't we have a situation where it may be that the glass shattered because the operation was done in the wrong order, inconsistently with the instruction given in the 2004 manual, or it may be done because of the position that the glass was in, but in either event, isn't it the plaintiff entitled to have the expert testify as to the warning to then let the jury decide what the causation was? Was the cause here the positioning of the glass, in which case the need for the warning is irrelevant because it didn't cause the accident and you can't make that your cause of action, or is the injury here not because the glass was mispositioned, but because the mechanic wasn't properly instructed on the order in which to perform the operation? Why isn't that a jury question, not a deliberate issue? Your Honor, it would certainly be a jury question if the plaintiffs offered both a qualified expert and an expert who had come to that conclusion based on a reliable methodology here. There are various cases within the Third Circuit that have held not only that an expert who's not qualified and a warnings expert cannot, in fact, opine that a warning should have been provided, but there are also cases in the circuit who have held that a warnings expert or a human factors expert cannot testify as to what warning should have been provided if not based on a scientific or reliable methodology. And in this case, as the district court correctly found, Mr. Clauser presented the court with neither to hold on to. What testing would you have done? What would you suggest be done? Your Honor, as far... And I'm not just suggesting that testing should have been done, Your Honor, but testing could have been done to measure the stresses to determine or to try to repeat the plaintiff's accident so that Mr. Clauser could come to a reliable conclusion that it was the failure of proper instructions that caused the glass to shatter. If the glass was mispositioned, what difference would it have made? Well, Your Honor, it wouldn't have made any difference. If the glass was mispositioned, then the whole issue of warnings is out the door because everybody agrees that no warning was needed for the glass. Aren't you really making a different argument, which actually may be an appealing one? Is your argument that the expert has to say not only that there's no warning in here, but it was the failure of the warning with the heating presumption that caused the accident? That's what an expert has to say, and you're saying in this case, while he may have validly, although you wouldn't concede that, he may have validly pointed out the need for a warning and the need for a proper set of instructions, but he hasn't opined that that was the cause of the accident and that he doesn't know whether the accident was caused. And so it's not so much that he's a bad expert as that there's no expert on the causation issue. Is that what you're arguing? It's both, Your Honors. I am arguing both for lack of qualification, but that's why I do keep coming back to the causation element. Even taking plaintiff's arguments 100% and adopting them, which this circuit has never done and has specifically failed to do, even taking that, the plaintiff cannot tie the necessary causation element and therefore still fails. That's really a different kind of issue because you could say, yeah, he's testified adequately, or somebody else could say. We wouldn't ask you to say it. But somebody could say his testimony about the need for a warning and what the warning should look like, at least in general, was pretty much okay. But what he didn't say is that, you know, with the heating presumption or whatever, that it was that failure which caused the accident, that, in fact, he recognized there might be something else that caused the accident. And also, doesn't that, what you just said, doesn't that sound like an argument to the jury? I mean, there's got to be some kind of testing you could do or something, if you think testing should be done at all, that would present an issue to the jury as to whether there's a failure to warn or a failure to warn adequately. Your Honor, twofold. First, the issue to be presented to a jury first has to comply with the Daubert requirements. There has to be a basis for the testimony on which the jury can come to a decision. And it is undisputed in this case that an expert was, in fact, needed. The plaintiffs haven't disputed that. What expert would you, let's say you were on the other side, what would you do to make an expert qualified to testify as an expert with regard to the inadequacy of the warning? Your Honor, the expert could have tested first in any method to determine both the cause of the actual glass fracture and that if a proper procedure had been followed, the glass fracture would not have occurred. He could have looked at other manufacturers' manuals to see what other warnings in the industry were, in fact, provided. He could have replicated or observed the hinge replacement procedure that he criticized. And, again, we come back to doing anything that would allow Mr. Clouser to opine that the allegedly defective instruction was causally connected to the plaintiff's injury. And that is something that an expert needs to be able to do. And that is, in fact, why a human factors expert or some expert like that was needed in this case. The first three clearly are engineering issues, right? The cause of the fracture, the look to how other manufacturers did it, replicating the hinge replacement, those are all engineering issues. Those aren't communication issues. Yes, Your Honor. Then you say the last one is anything that the instruction that was given caused the injury. Yes, Your Honor. That's not communications. That's engineering. Still engineering, right? That is. And I actually left one out. And this would go to the instructions. But he also could have looked at peer-reviewed articles or other literature in the scientific field. Does that apply to a Kimbrough type expert? He's still a Kimbrough, a Kumho-Tyre, excuse me. You've got sentencing on the brain. That is a Kumho-Tyre type of expert. And one of the cases that both of you cite in your brief, I think, in some extent, is the Milanovic case, which I wrote, on how you evaluate a Kimbrough, a Kumho-Tyre by the factors you look to. Yes. And, you know, it's one thing if you want to know whether dioxin causes cancer. Then you look at replicating, reproducing results, a scientific type of expert. But a semi-engineering expert, even an experiential type of expert, a lot of those don't. By the way, is there testimony in this case as to whether the glass was misplaced when he was putting the hinge or not? Absolutely. Mr. Clouser states that the glass was mispositioned at the time that Mr. Panetta was putting the glass in. At the time that he was replacing the hinges. Did he say what, if any, impact the placement of the glass could have on the necessity of following a certain procedure in putting the glass on? He said that that, combined with other factors, led to the fracture of the glass. Go ahead. I'm sorry. I'm sorry. You go ahead. That was my question. Combined with other factors. But does that mean that after the misplacement of the glass, if the glass had properly been placed, the other factors would still have created an increased risk for the glass to fracture? Or did he say that? I don't know if he specifically said that, Your Honor. But he could not rule out that the misalignment alone, if all other procedures had been correctly followed, would not have caused the glass to shatter. Let me go back to then. You gave me five things you would do if you were on the other side, and they all look to me like they require an engineering expert. Your Honor, you're correct, and that does go in part to the reliability factor of Daubert and part of why the lower court did exclude Mr. Clauser's opinion. I think that there's twofold. I think he had two hurdles to overcome here. One hurdle was having the scientific basis to be able to state the causation element as to why the glass shattered. And then you also have the separate question as to whether he was qualified then to render an opinion as to whether the glass shattered. It sounds like you're not challenging that. He could. Maybe he should have done some more testing. But he was an expert qualified to talk about what causes this type of glass to shatter. Your Honor, yes, he was an expert qualified to do that. If he was qualified to do that, he did not, in fact, do that in this case. He both admitted that he could not determine exactly why. You're not undermining, you're not challenging his qualifications as an engineer to address what is an engineering problem at issue and forget about how you communicate an engineering problem with a mechanic. You're arguing that he didn't do the kinds of things he needed to do as an engineer to render an opinion that would be admissible under Daubert. That's part of it, Your Honor, yes. And what's the other part? And then the other part is if he had done that, would he then be qualified to render an opinion as to whether, it's not just whether a warning should have been provided here. Everybody agrees that there were instructions provided and that an experienced engineer did look to those instructions and follow them. And, by the way, this experienced engineer did ignore one of the steps that also could have played a factor in, there were three factors that could have been, at least, that could have been a part as to why the glass shattered. And that's another reason why you would need a human factors expert to say not only would a warning need to be provided, but that he would have followed it. His opinion, I got it right in front of me, before his deposition. He says, Mr. Pena was injured when the lift glass broke when he tightened a hinge nut and a section of glass fell and cut his leg. The incident occurred because, and I'm going to leave the defective part out. He said the lift glass was defective. I'm going to leave that out. The incident occurred because it, meaning the glass, was only marginally able to resist fracture in its intended service and the pertinent manual and boltings lacked adequate instructions and warnings. Okay, no improper action by Mr. Pena to cause this incident to occur. Okay, that's his opinion. He's saying that taking a defective out, it's still that there was, that this glass was prone to shatter. And there's reasons, he explains that earlier from an engineering point of view, why that's the case. And he says there were inadequate instructions. And I don't see anything about misplacing the glass or that somehow that Mr. Pena did something wrong. Your Honor, that comes out in the Daubert hearing. He testified to that in the Daubert hearing before the lower court and stated in no uncertain terms that Mr. Pena did misposition the glass and that no warning or instruction needed to be provided by, for, to Mr. Pena about mispositioning the glass. It still sounds like a maybe summary judgment, maybe trial, but it's got nothing to do with Daubert. Your Honor, respectfully, I would disagree with that. And if you look at the cases cited in the brief, Kumho Tyer, Molanowicz, Willis, all of these cases state that that is not, in fact, a summary judgment issue or an issue for the jury. But it is, in fact, a Daubert issue. On both, on qualifications and on reliability. Yeah, but you're talking about causation there, not reliability, Daubert analysis. What we're talking about is can this individual qualify as an expert or should he have been qualified as an expert in a failure-to-work case? And the answer to that, Your Honor, pursuant to all of the case law cited in the brief, is no. Even experts who are warnings experts have been found not to be able to testify as to certain things. But in every case that I found and was cited in the brief in this circuit where somebody who was not qualified as a warnings expert wanted to state simply there should have been a warning, at least that was on appeal, the ones that we cited to, the court found that the expert was not qualified. Don't you still come down to the argument that even if he's fully qualified on the warning and that there should have been a warning and there should have been instructions and all that, that he hasn't opined in effect that the failure, although he did in the written one, but when you take his deposition into account, he really hasn't opined on an essential element of the plaintiff's case, which would be a summary judgment issue but not necessarily a qualification issue. You have a perfectly qualified expert who testifies as to something, but it's not enough. That's why sometimes plaintiffs have to meet two or three experts because you cover different issues. Aren't you really saying that an expert has to do more than just say that there should have been a warning here? He has to show that the warning, or that the plaintiff has to show, not necessarily the expert has to show, that the plaintiff has to show that that failure was a proximate cause of the accident? In this case, Your Honor, which actually... Is that what you're really saying? That's not what I'm saying, Your Honor. That's what you're saying, too. In this case, what I am saying is that the lower court correctly found that Mr. Clauser was not qualified to render the opinion he sought to render, nor did he have any reliable basis which would aid the jury in any way in formulating a decision in this case. There's a lot going into that one sentence, and I'm trying to break it down between the underlying... I'll use the term defect. The underlying defect, which he is, I think you'd agree, qualified to render an opinion about, and you'd say, had he done the kinds of things he had to do to reach a reliable opinion, but he's an engineer, and we're talking about an engineering kind of problem. That's one issue. The other issue is whether or not the underlying, again, the term defect existed. If it did exist, was it necessary to warn a mechanic about the existence of that defect? How do you warn it? Maybe then you need a different kind of defect. The third problem is, even given the warnings and the possible defect, whether or not... Let's assume that the warnings were on the glass and that there was a defect in the glass because of the order in which it had to be installed. You're saying there's still an issue because the glass was misplaced when it was being installed, but that's where I have the biggest problem because it seems to me clearly that's not a Darwin issue. That's what Judge Emery said. That's a jury issue. He argued that to the jury that, okay, fine, there should have been a warning on it, and the glass was made out of peanut butter or whatever, but the way he had that glass, that's what caused the accident, not the fact that the glass shattered because of the order in which he put it on. He was mining that glass and operating on it in a way that even if there had been a warning, even if he had done the proper procedure according to the 2004 manual, it still would have fractured because of the placement. But then don't you need an expert to say that? Your Honor, yes, and we did, in fact, have an expert to say that. You talked about the placement of the glass and where it shattered in the end. Yes, and that the placement of the glass was, in fact, the cause of the glass shattering. But one of the main problems here and what the lower court correctly found was that there was no methodology relied upon at all by Mr. Clouser on which to form any basis to rely upon his opinions, as this panel has correctly noted when Mr. Withers was speaking. No basis at all on which to rely on what? That the warnings were defective in 2002? Yes. He relied solely on subjective items. He did not look to anything objective, and there was absolutely no reliability for his opinions. This case, in fact, in Kumho Tire, since we've talked about it, in that case, the expert based his conclusion solely on a visual inspection of the tire and his own experience in the industry, and the court determined that he was not qualified or that his opinions were not reliable in that manner. And in here we have an expert who, even if you get past the qualifications hurdle, which I state is an issue, even if you get past that, this is all he did. He looked at a visual inspection of the subject vehicle and his experience in the industry and some subjective testimony, and he came to this opinion, which is more what you would think an expert coming in to initially look at a case would come to a conclusion, and then proceed to do some sort of methodology to support that conclusion and then put that forth in an opinion. But in what sense? It's a simple case. He's saying, yeah, the plaintiff is saying that if he followed correctly the 2002 manual, there would nonetheless have been this breakage. That's it. And therefore, the mistake that was made is that the manual didn't correctly warn what to do. And then the expert would say, what is that thing that should have been done to warn? I don't think up to that last point that there's anything you can challenge there. I mean, that's their argument, right? I believe that that is their argument. You could say that even the 2002 manual is still fine, et cetera. With the caveat that there were instructions there that the plaintiff did follow, that if followed would not have caused the glass to shatter, yes. I disagree. I mean, I was just looking. Doesn't he really say that the order, because remember, you're replacing the hinges, but you're also replacing, I don't even know what they call them, but the two units on the side, the struts that sort of make the thing go back slowly. Right. And doesn't he say, even the misalignment you talk about, doesn't that result because he did things in the wrong order? The misalignment, no, is not because he did things in the wrong order. And, in fact, while Mr. Clauser did discuss the order of the replacement of the hinges themselves, he actually flip-flopped his testimony. So you have to look both at his deposition testimony, in which he stated that the torquing should have been done on the glass side first, I mean last, and on the body side of the vehicle first. He flip-flopped that later in the Daubert testimony, and he agreed that the procedure that the plaintiff did follow, as provided in the instructions, wherein the glass was torqued first and then the body side was torqued, that that was, in fact, followed. And the only thing that was not followed was that the plaintiff performed the hinge replacement while the struts were still in place and that the struts should have been disconnected, and that was provided for as an instruction in the manual. And what Mr. Clauser sought to state and to opine was that there should have been a warning saying, if you don't do what the instructions have already provided, there is a risk of glass shattering. And what is important to note here is that this is an experienced mechanic who admitted that he knew the risks of glass shattering, so it's not sufficient just to say a warning should have been provided. He knew of the risks. You necessarily have to go into what language needed to be in that warning to show the experienced mechanic that more so than the risk that he already knew, but to have properly instructed him. So you're saying there's no difference between the 2004 and 2002 instructions, just the 2004 had a warning in it? That's the only difference? There are differences, but that is the main difference, that the 2004 had more language in it that stated warning, yes. And additionally, as far as the 2004, the plaintiff spent a whole section in the appellate brief, or the appellate spent a whole section in the briefing about that, but I think it is important to at least note that the lower court's decision was not in any way based on the inadmissibility of that alternative warning. Mr. Clouser first of all never stated that he wanted to propose that as an alternative warning, and the court didn't state that he couldn't use it as an alternative warning. The lower court just said in the reliability problem, the lower court looked at the fact that Mr. Clouser didn't look at any other manufacturers' warnings and used their instructions to see what other manufacturers were doing in the field to render that opinion. Can I read you something from the deposition? Yes. What I was going to say is this 2004 hinge replacement procedure is a good procedure. Had it existed in 2002, or at least had it been given to the plaintiff in 2002, I don't think we would be here then by Ms. Alexander. So what you're saying is that based on the procedure in 2004 being reasonable, in your opinion, had he had it two years earlier, he wouldn't have misaligned the glass as he was installing it. That's my judgment of Pineda. That he was a pretty conscientious guy. Had he read this, I think he would have followed it. So you believe that he did misalign the glass, but he did so because he didn't have enough instructions not to. That's correct. That's a very different thing to that. His position is that he just made a mechanical error and put the hinges in the wrong place on the glass. That's not his testimony. It's not really a fair reading of his testimony, I don't think. He never subsumed the misalignment. All this argument that the warnings that he's talking about that should have been furnished, if the glass did shatter because of the misalignment, or that also he said he would be traced back to the failure to warn because had he properly warned, he wouldn't have aligned the glass the way he aligned it, according to that. Your Honor, respectfully, what we are here before is an abuse of discretion standard on an evidentiary ruling, and the lower court is required broad latitude. In this case, in particular, all of the Third Circuit opinions that have been pointed to in the briefing all support the lower court's decision in this case that Mr. Clauser should not have been qualified as an expert on warnings, should not have been permitted to render an opinion that a warning should have been provided, and also that his opinions and his methodology were unsupported. He had no methodology, and as the Milanovic case stated, before a court can even evaluate the reliability of an expert's methodology, the expert must employ one, and the problem here is this expert did not even employ a methodology. Now, Mr. Williams is saying he did have a methodology that may not have been adequate in your eyes, but he's saying he did have a methodology, and assuming he's saying that the methodology that he had was consistent with the kind of question that he was being asked. But the methodology, Your Honor, that he provided was a wholly subjective methodology that has been repeatedly held to not be sufficiently reliable by the courts. Including Kalmau Tire. Okay, thank you. Did you have time for this? I can't remember now. I did not, Your Honor. No, he didn't. Thank you, Your Honor. All right, we thank you both for a very helpful argument. We'll take a minute of your time. We'll have a brief break before the next case for the Markovits v. State of Philadelphia. Please rise. The court stands in recess. The court is now in session.